SCANDIA DOWN CORPORATION, a California Corporation, and Goose Down, Inc., an Illinois Corporation, Plaintiffs-Appellees,

v.

EUROQUILT, INC., a New Jersey Corporation, Defendant-Appellant.

No. 85–1193.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1985.

Decided Sept. 13, 1985.

Jeremiah D. McAuliffe, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., for defendant-appellant.

Carl E. Moore, Edward M. O'Toole et al., Chicago, Ill., for plaintiffs-appellees.

Before COFFEY and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.*

EASTERBROOK, Circuit Judge.

Scandia Down Corp. franchises a nationwide chain of 56 stores selling bedding products, including down-filled comforters.

* The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is

Since 1976 its principal trademark has been a logo with its name and an outline of a goose.

Scandia has spent more than $1.5 million in promotions using the trademark. This trademark is not registered, and accordingly questions of infringement concern common rather than statutory law. (Two related marks are registered, one in Illinois and one with the United States, but we need not consider them.)

Euroquilt has three stores on the east coast and for a while had a store in Chicago. It, too, sells bedding products. Until 1982 Euroquilt sold its products under the name Euroquilt and Continental Quilt, although one of its stores used a small sign with the words "The Down Shoppe" to describe a department. In April 1982 Euroquilt adopted a new logo to identify its stores and products.

The logo precipitated this suit, and in November 1982 the district court entered a preliminary injunction against the use of this logo "or any colorable imitation thereof" in connection with Euroquilt's promotion or sale of comforters or bedding products.

In March 1983 Euroquilt started using a new logo, with the same typeface (Souvenir Bold) but a new goose.

sitting by designation.

Scandia almost immediately objected that this logo violated the preliminary injunction, and Euroquilt promptly substituted a third logo.

This logo brought the parties back to court, with Scandia insisting that "Down Shoppes" in Souvenir Bold, coupled with a goose, was a "colorable imitation" under the injunction. A magistrate agreed, recommending in September 1983 that Euroquilt be held in contempt. The magistrate concluded, after the parties had produced evidence, that the new logo had caused substantial confusion. The magistrate did not comment on the difference between recumbent and airborne geese.

The district court took the magistrate's recommendation under advisement and held a trial in October 1983 on Scandia's request for a permanent injunction. After the trial Euroquilt started using a fourth logo, again in Souvenir Bold but this time sans goose.

Scandia objected yet again, and the district court held a supplementary hearing on Scandia's request to hold Euroquilt in contempt a second time.

The district court disposed of all pending disputes in a single opinion. The court held Scandia entitled to a permanent injunction on the ground that Euroquilt's first logo was similar to Sandia's logo and had caused confusion, that the infringement was wilful, and that Euroquilt designed its logos "in a deliberate effort to capture [Scandia's] customers." The court adopted the magistrate's recommendation that Euroquilt's third logo violated the preliminary injunction because it was a colorable imitation of the first logo. Because this finding of contempt made Euroquilt a repeat offender, the court concluded that Euroquilt also must stop using its fourth logo. The court enjoined Euroquilt's use of "The Down Shoppe" in Souvenir Bold "or substantially similar typeface." It ordered Euroquilt to turn over to Scandia all profits made between the filing of Scandia's first motion to hold Euroquilt in contempt and

the time the infringing logos no longer affected Scandia's sales.

## I

Euroquilt was not represented by counsel at trial. Counsel who had represented Euroquilt through the hearing on contempt withdrew before trial, protesting that they had not been paid. The district court gave Euroquilt a month to obtain new counsel but declined to postpone the trial further. Euroquilt did not, and it went to trial "represented" by Monte Dow, its president and sole stockholder. Scandia did not object to this. After trial Euroquilt retained new counsel, who filed a motion for a new trial on the ground that a layman may not represent a corporation. Counsel repeat this argument on appeal.

■ The basic proposition is correct. A "corporation" is an abstraction, and abstractions cannot appear pro se. The corporation is just a convenient name for a complex web of contracts among managers, workers, and suppliers of equity and debt capital. Dow may have been the sole equity investor in Euroquilt, but he did not represent other interests such as those of creditors. Cf. *Upjohn Co. v. United States*, 449 U.S. 383, 390–92, 101 S.Ct. 677, 683–84, 66 L.Ed.2d 584 (1981) (rejecting the proposition that senior managers and the corporation have identical interests). We have held that corporations must appear by counsel or not at all. *Strong Delivery Ministry Ass'n v. Board of Appeals*, 543 F.2d 32, 33–34 (7th Cir.1976). See also, e.g., *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385–86 (11th Cir.1985); 28 U.S.C. § 1654. If Scandia had objected to Dow's representation of Euroquilt, the district court would have been required to prevent Euroquilt from appearing at trial.

■ The upshot of this would have been the entry of a default judgment for Scandia, unless the district court was required to give Euroquilt more time to. obtain counsel. But Euroquilt had had counsel before, and its decision to put its lawyers' bills at the bottom of the stack caused the problem of which it now complains. A corporation may not grant itself a continuance by manipulating things so that it has no counsel.

The district judge would have been entitled to dismiss the case—which she said she would have done—rather than force Scandia to wait indefinitely for Euroquilt to retain counsel. Cf. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (whether to dismiss a case for plaintiff's procedural failings rests in the discretion of the district court); *Trakas v. Quality Brands, Inc.*, 759 F.2d 185, 189–91 (D.C. Cir.1985) (Scalia, J., dissenting).

■ At all events Euroquilt cannot protest its own decision to proceed with Dow in the courtroom. See *Schifrin v. Chenille Mfg. Co.*, 117 F.2d 92, 94–95 (2d Cir.), *cert. denied*, 313 U.S. 590, 61 S.Ct. 1114, 85 L.Ed. 1545 (1941). If Dow's decision injured creditors of Euroquilt, they might have an action against him, but this is not a good reason to put Scandia through a second trial. Given its alternative of a default judgment, Euroquilt may not say that any technical error in permitting Dow to appear in court—if this is an error when the adversary does not object—was harmful within the meaning of Fed.R.Civ.P. 61.

■ One more preliminary matter. Euroquilt says that we should review the district court's findings about the similarity of the logos and the likelihood of confusion for "error" and should not defer to the district court's findings or apply the clearly erroneous principle of Fed.R.Civ.P. 52(a). Euroquilt offers several reasons, none persuasive.

First Euroquilt draws a distinction between "factual" issues governed by Rule 52(a) and "mixed questions of law and fact," which should be reviewed more freely. Although the existence of confusion in the past is a factual issue, Euroquilt insists that the likelihood of confusion in the future is a mixed issue. It points to *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 935 (7th Cir.1984), which holds not erroneous a finding of likelihood of confusion while holding not clearly erroneous a finding of actual confusion. If the "clearly erroneous" rule applied to findings of likely

confusion, Euroquilt insists, the court would not have spoken of error in *Piper*.

This is altogether too much weight to put on the omission of a word. Opinions are not bond indentures. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341–42, 99 S.Ct. 2326, 2332–33, 60 L.Ed.2d 931 (1979); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 459–62, 98 S.Ct. 2441, 2449–51, 57 L.Ed.2d 337 (1978). Judges become weary of the endless repetition of the same formulas, and they have the liberty to omit a word or two in a sentence without causing avulsive changes in the law. The likelihood of confusion in the future is a question of fact to which this circuit has applied the clearly erroneous rule. See *Piper, supra,* 741 F.2d at 939 (Posner, J., concurring); *Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 354 (7th Cir.1983); *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 857 (7th Cir.1982). We need not determine when, if ever, "mixed" questions are reviewed under a different standard; the question of likelihood of confusion is all fact and no law.

Euroquilt also tells us that likelihood of confusion is an "ultimate" issue and therefore should be reviewed more carefully. The Federal Circuit apparently takes this position. E.g., *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1445 (Fed. Cir.1984); *Giant Foods, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1569 (Fed. Cir.1983). The proposition that "ultimate" findings should be reviewed with special vigor has drifted in and out of appellate cases for decades. Although we should think carefully before disagreeing with the views of the Federal Circuit, a specialist court on questions concerning intellectual property, we will not change the standard reflected in cases such as *Henri's Food.* The Supreme Court held in *Pullman-Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982), that Rule 52(a) does not permit any distinc-

tion between ordinary and "ultimate" findings. The Federal Circuit's cases do not discuss *Swint,* and we conclude that they are inconsistent with that case.

The third argument is that we can examine the logos as readily as the district court, and therefore we should review as an original matter the conclusion that they are confusingly similar. Here, too, Euroquilt invokes a line of argument that has been used with success in many appellate courts for many decades. Here, too, we are under instructions not to follow. *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985), explicitly rejects cases holding that appellate courts may substitute their own view of factual findings based on documentary evidence.

■ The district court's authority to decide factual issues is just that—authority. Rule 52(a) is not a rule of preference that the judge in the best position to listen to an inflection in a witness's voice should determine credibility. The district judge is manager of the entire swirl of facts, and the clearly erroneous rule is based in substantial measure on a belief that because appellate courts never are in a better position than the district court, and often are in a worse one, a substitution of judgment would increase the randomness of the process without increasing accuracy over the run of cases. "Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources." *Anderson, supra,* 105 S.Ct. at 1512.

This case illustrates one of the reasons for that approach. We can examine the trademarks as the district court did. But the legal question is not whether the marks look similar to us but whether they look similar to ordinary consumers of bedding products.[1] We have no way to find out

---

1. Learned Hand insisted that the standard was careless rather than ordinary consumers, see *Caron Corp. v. V. Vivaudou, Inc.*, 4 F.2d 995, 997 (2d Cir.1925); *American Chicle Co. v. Topps Chewing Gum*, 208 F.2d 560, 563 (2d Cir.1953), but our court has adhered to the "ordinary" purchaser standard of *Coats v. Merrick Thread Co.*, 149 U.S. 562, 572, 13 S.Ct. 966, 969, 37 L.Ed. 847 (1893). See *FS Services, Inc. v. Custom Farm Services, Inc.*, 471 F.2d 671, 675 (7th Cir.1972); *Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 8 (7th Cir.1950).

how ordinary consumers perceive the marks; the district court, on the other hand, heard testimony on that subject and received evidence of actual confusion. It would be little short of arrogation for an appellate court to claim that just because every judge can bring to bear his own view of what is similar and what is not, the appellate judges' view must be the right one. See *Exxon Corp. v. Exxene Corp.,* 696 F.2d 544, 549–50 (7th Cir.1982) (similarity between Exxon and Exxene is a question for the jury).

The amendment to Rule 52(a) that became effective August 1, 1985, provides that findings of fact, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous". The Advisory Committee's note to the amendment states that the new language ("whether based on oral or documentary evidence") is designed to apply the clearly erroneous rule to every form of evidence the district court considers. It explains: "To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority." The Advisory Committee identified *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982), as among the cases the new rule would alter. To the extent cases such as *Atari* and *Union Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 366, 383 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976), put us in the business of reviewing for mere error findings based on documents or any other kind of evidence, we were put out of it on August 1. The clearly erroneous rule now applies across the board.

▮ Euroquilt's final argument is that we must review the district court's findings with special care because that court adopted findings drafted by Scandia. We have often criticized district courts for doing this, but *Anderson* holds that the resulting findings are nonetheless those of the district court and entitled to the usual deference. 105 S.Ct. at 1510–11. Although we might imagine circumstances even after *Anderson* in which adoption of findings demonstrates such an abdication of the judicial function that we must return the case to obtain the judge's *own* views on the matter, even then we would not substitute our views for those of the district court or alter the standard contained in Rule 52(a).

Here, however, it is evident that the district court paid careful attention to the evidence. The submissions of the parties suggest that Scandia adopted the district court's findings in issuing the preliminary injunction when making proposals, so that the judge's adoption of Scandia's proposals largely reiterated her independent findings from an earlier stage of the litigation. (These, in turn, had been shaped by the magistrate's proposals, not by Scandia's.) The judge also wrote a narrative opinion that is entirely her own creation. The court's findings deserve and receive all the respect Rule 52(a) requires. Under that Rule, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson, supra,* 105 S.Ct. at 1512.

II

Trademarks help consumers to select goods. By identifying the source of the goods, they convey valuable information to consumers at lower costs. Easily identified trademarks reduce the costs consumers incur in searching for what they desire, and the lower the costs of search the more competitive the market. A trademark also may induce the supplier of goods to make higher quality products and to adhere to a consistent level of quality. The trademark is a valuable asset, part of the "goodwill"

of a business. If the seller provides an inconsistent level of quality, or reduces quality below what consumers expect from earlier experience, that reduces the value of the trademark. The value of a trademark is in a sense a "hostage" of consumers; if the seller disappoints the consumers, they respond by devaluing the trademark.[2] The existence of this hostage gives the seller another incentive to afford consumers the quality of goods they prefer and expect.

The more valuable the trademark, the more other firms will be tempted to take a free ride. By adopting similar marks, the imitators induce consumers to select their goods when the customers meant to select the goods of the firm that created the mark. Confusingly similar marks make consumers' task in searching for products harder. The similar mark also dilutes the hostage value of the first, because the firm that created the mark may lose business on account of the inferior products of its rival, while the rival may not lose as much business as its own quality dictates because customers mistakenly blame the first firm for the failings of the second. As marks become less useful for identification, search, and hostage purposes, firms invest less in them and consumers suffer. This is a familiar pattern in antitrust law, where retailers may try to take a free ride on the services provided by their rivals. See *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The concern is no less serious in the law of intellectual property. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, — U.S. —, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (copyright); *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980) (patents); *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (general intel-

lectual property); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916) (trademarks). See Douglas G. Baird, *Common Law Intellectual Property and the Legacy of* International News Service v. Associated Press, 50 U.Chi.L.Rev. 411 (1983).

The concern about the free ride does not always help the proprietor of the first mark. He, too, is not permitted to appropriate what he did not create. There are but a limited number of words and images suitable for use in describing a product, and sellers own neither the English language nor common depictions of goods. Descriptive items (such as "down") are therefore not readily appropriable. In the language of trademark law, they are protected only if they have acquired a "secondary" meaning, a meaning associating the words with a particular item or supplier. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982); *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 905–08 (7th Cir.1983); *Union Carbide Corp. v. Ever-Ready, Inc., supra*, 531 F.2d at 380. If descriptive words and pictures could be appropriated without evidence of a secondary meaning, sellers could snatch for themselves the riches of the language and make it more difficult for new entrants to identify their own products; consumers would be worse off.

The dispute in this case is largely about whether the words "Down Shop[pe]" in connection with the goose in Scandia's logo are merely descriptive. If they are just "descriptive" Scandia is trying to take a free ride on the language. If they are more—"arbitrary" or "suggestive" in the argot—then Scandia has done its own work and Euroquilt arguably is trying to take the free ride. Euroquilt says Scandia's words and drawing are descriptive. Scandia says that they are "arbitrary" or "sug-

**2.** The effects may be substantial. Two empirical studies show that firms whose products are recalled or whose advertisements are censured lose sums that substantially exceed the cost of fixing the recalled products or withdrawing the ad campaign. Gregg Jarrell & Sam Peltzman, *The Impact of Product Recalls on the Wealth of Sellers*, 93 J. Political Economy 512 (1985); Sam Peltzman, *The Effects of FTC Advertising Regulation*, 24 J.Law & Econ. 403 (1981).

gestive," which means that they are more easily protected.[3]

The words and pictures surely are "descriptive" if taken one at a time. But that is not the right way to take them. The eye sees the combination of words, typeface, and goose as a unit. The perceptual gestalt may make one combination seem very like another—or very different—even though both have the same formal elements. The district court therefore must consider each mark as a unit. *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 505 (5th Cir.1980); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976). The district court properly considered the marks as units in this case and was entitled to conclude that none of the marks is merely descriptive.

■ The court's conclusions that Scandia's mark identifies a product with Scandia, and that Euroquilt's marks are confusingly similar to it, are not clearly erroneous. Both marks refer to down shops and contain a goose; the marks have similar typefaces. The district court heard much evidence that customers came to Scandia's shops to complain about goods and services they had received (or not received) from Euroquilt; Scandia's employees testified to more than 180 incidents over five months in which people mistook Scandia for Euroquilt in either New York or Chicago. Two of Euroquilt's employees conceded that customers came to Euroquilt's shops seeking goods from Scandia. Euroquilt says that the confusion may have been caused by its omission from the Chicago Yellow Pages for the period in question; perhaps so, but this is not the sort of sally that would permit us to call the district court's finding clearly erroneous. This conclusion does not permit Scandia to appropriate any of the words and images singularly. Euroquilt presses on us the claim that some 13 other sellers of down products use logos

containing geese and the word down; that none of these has (so far) caused any confusion with Scandia's mark demonstrates that the mark does not preempt generic words and images.

■ Worse for Euroquilt, the district court found that Euroquilt intended to infringe Scandia's mark "in a deliberate effort to capture [Scandia's] customers." Euroquilt adopted its new logo only after Scandia rebuffed its offer to merge. The finding on intent, too, is not clearly erroneous, especially given what followed—Euroquilt's effort to evade the injunction. Because we find that there was actual confusion and that consumers identified the original mark with Scandia, we need not decide whether the combination of name, goose, and typeface in any of the marks was "arbitrary" or "fanciful."

III

■ This leaves for decision the two findings of contempt, on which the district court based the award of profits. Euroquilt maintains that the preliminary injunction is too vague to support a finding of contempt. Fed.R.Civ.P. 65(d) requires every injunction to be "specific in terms" and to "describe in reasonable detail … the act or acts sought to be restrained". Because violation of an injunction invites serious penalties, Rule 65(d) states an essential requirement of any order. *Schmidt v. Lessard*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *American Can Co. v. Mansukhani*, 742 F.2d 314, 332–33 (7th Cir.1984). But the Rule does not require the impossible. There is a limit to what words can convey. The more specific the order, the more opportunities for evasion ("loopholes"). There are millions of possible logos to which Euroquilt could have turned. Any effort to identify and prohibit one million of them would have left another million or more subject to dispute.

3. We have said before that "arbitrary," "suggestive" and the other words in the vocabulary of trademark law may confuse more readily than they illuminate, see *Walt-West Enterprises, Inc. v. Gannett Co.*, 695 F.2d 1050, 1055–57 (7th Cir.1982), a caution litigants should take seriously before arguing cases so that everything turns on which word we pick. It is better to analyze trademark cases in terms of the functions of trademarks. That frees the arguments from the clutches of Webster's Third and the conflicting advice of text writers.

■ The operative words in the preliminary injunction—"any colorable imitation" of a particular logo—are words of legal art. Euroquilt does not propose a formulation that would have given it better notice. "Colorable imitation" leaves a lot to the imagination, but Rule 65(d) does not require a torrent of words when more words would not produce more enlightenment about what is forbidden. When the difficulty stems from the inability of words to describe the variousness of experience, the court may prefer brief imprecise standards to prolix imprecise standards. The right to seek clarification or modification of the injunction provides assurance, if any be sought, that proposed conduct is not proscribed. Euroquilt did not seek modification or clarification from the district court; it did not ask for assurances that the third or fourth logos are permitted, even though Scandia's objection to the second logo put Euroquilt on notice that Scandia would almost certainly object to the third. Euroquilt has only itself to blame for its current predicament.

■ Euroquilt's further argument that because of the difference between sitting and flying geese its third logo is not a "colorable imitation" of Scandia's logo fails for two reasons. One, the district court found that it is a colorable imitation and that it had in fact caused substantial confusion; neither conclusion is clearly erroneous. Two, the preliminary injunction barred Euroquilt from using a colorable imitation of its own first mark, not from imitating Scandia's mark. Euroquilt's third mark is similar, down to the typeface, to its first mark. Euroquilt protests that trademark injunctions should bar imitation of the plaintiff's mark, not of the infringing mark. Perhaps so, but this one did not. What the injunction actually says—not what the parties think it ought to have said—controls subsequent proceedings in contempt. *Pasadena Board of Education v. Spangler,* 427 U.S. 424, 438–40, 96 S.Ct. 2697, 2705–07, 49 L.Ed.2d 599 (1976).

The fourth logo does not contain a goose, and Euroquilt insists that it is entitled to use such a logo. If the fourth logo had been introduced in place of the second, Euroquilt might have had a good point. The district court conceded as much. But the district court properly took into account Euroquilt's "history as an infringer and contemner" in deciding to restrict its leeway in designing new logos. The court drew a line between logos using Souvenir Bold or any similar typeface, and logos that have a different appearance. Euroquilt designed a new logo in a typeface similar to Souvenir Bold with a heart-shaped figure in place of the "o" in "Down"; the district court stated that this logo would not be condemned in the absence of evidence of actual confusion.

■ A district court possesses substantial discretion to decide how close is too close, once an infringer has committed a contempt of the original injunction. The court may require the contemnor to choose a distinctively different mark rather than to hew so close to the line that the parties must interminably return to court to haggle about every mark. See *National Van Lines, Inc. v. Dean,* 288 F.2d 5, 10–11 (7th Cir.1961); *Independent Nail & Packing Co. v. Stronghold Screw Products, Inc.,* 215 F.2d 434, 436–37 (7th Cir.1954). Cf. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 697–99, 98 S.Ct. 1355, 1368–69, 55 L.Ed.2d 637 (1978) (discussing similar principle in antitrust law). The district court did not order Euroquilt to drop the words "down" or "shop[pe]"; it simply put one combination of words and typeface off limits. This is a modest restriction on the universe of logos available to Euroquilt, which now must live with the consequences of its prolonged disregard of Scandia's rights.

A<small>FFIRMED.</small>