SPRAYING SYSTEMS COMPANY, Plaintiff,

v.

**DELAVAN, INC., Defendant.**

**No. 89 C 8447.**

United States District Court, N.D. Illinois, E.D.

March 22, 1991.

Lawrence S. Wick, John Michael Curtin, Mary Catherin Merz, Leydig, Voit & Mayer, Chicago, Ill., for plaintiff.

Daniel M. Riess, Daniel R. Pastirik, Lockwood, Alex, Fitzgibbon & Cummings, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Spraying Systems Company ("Spraying Systems") has sued Delavan, Inc. ("Dela-van") to obtain (1) cancellation of Delavan's two federal trademark registrations for various spray nozzles and related goods bearing the mark "COLOR JET," alleging likelihood of confusion (Count I) and fraud in the procurement (Count II), and (2) injunctive relief on several claims: federal trademark infringement in violation of Lanham Act § 32(1)(a) (15 U.S.C. § 1114(1)(a)) (Count III), federal unfair competition in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)) (Count IV), and pendent state law charges of infringement and unfair competition (Count V). Delavan has now moved for summary judgment under Fed. R.Civ.P. ("Rule") 56, and both parties have complied with the filing requirements of this District Court's General Rule 12(m) and 12(n) applicable to such motions. For the reasons stated in this memorandum opinion and order, Delavan's motion is granted as to Counts I through IV, while Count V is dismissed without prejudice.

### Facts [1] and Procedural History

Spraying Systems has for many years been engaged in the manufacture, distribution and sale of spray nozzles and other spraying apparatus used in agricultural or industrial capacities. Beginning as far back as 1938, it has adopted and used a number of "–JET" suffix trademarks in connection with its goods, and it owns at least 35 valid federal trademark registrations to that effect—to name a few, AIR-JET, BOOMJET, CASTERJET, CONEJET, FOAMJET, QUICKJET and SNOWJET. In fact, many of Spraying Systems' customers refer to the company and know it better as "TeeJet," a trademark first used in 1948. Spraying Systems' annual sales of its goods marketed under various of the "–JET" composites have exceeded $20 million since 1981 and $30 million since 1986.

Delavan is the owner of two federal trademark registrations for the mark COL-

---

**1.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called upon to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Spraying Systems (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

OR JET,[2] used in connection with spray nozzles and equipment that Delavan admits are similar to Spraying Systems' and that Delavan also admits move through the same channels of trade to the same class of purchasers. COLOR JET is used principally in connection with nozzle tips used in agricultural applications. It seems most likely that Delavan first used its COLOR JET trademark in 1985, when it appeared in a price list (see Westergaard Dep. 37, P.Mem.Ex. 56), but in any case its first use was no earlier than 1982—long after Spraying Systems' first use of a "–JET" suffix in connection with goods sold in interstate commerce.

Both Spraying Systems and Delavan color code various of their spray nozzles. Individual colors are used to designate specific nozzle capacities or flow rates at a given liquid pressure. Spraying Systems promotes its color-coding system under the registered trademark VISIFLO in connection with its goods marked CONEJET, FLOODJET, FULLJET, SUPER TEEJET, QUICKJET, QUICK TEEJET, TEEJET, TWINJET, XR TEEJET, KQT QUICKJET, and QUICKFLOODJET. Delavan promotes its color-coding system under the registered trademark COLOR–BRATE in connection with its goods marked COLOR JET. Delavan began using its COLOR–BRATE system in 1982 and Spraying Systems began using its VISIFLO system in 1983. VISIFLO has the colors orange, green, yellow, blue, red, brown, gray and white. COLOR–BRATE has all of those colors with the exception of white and also has tan, light blue and light green.[3] However, the two systems do not use the same color to designate a particular nozzle capacity.

Spraying Systems and Delavan use different packaging in the sale and distribution of their goods (though the goods themselves are otherwise admittedly similar in appearance). Spraying Systems' packaging is yellow with black labeling, while Delavan's is red, white and blue. Each company clearly marks the source of the product with the relevant trademark "Spraying Systems" or "Delavan" on the packaging.

In 1983 there was a brief exchange of letters between lawyers for the companies, in which Spraying Systems requested that Delavan cease and desist in its efforts to register its COLOR JET trademark. When the COLOR JET mark appeared in Delavan's December 1988 catalog, it was Spraying Systems' first indication of actual marketing of the COLOR JET mark. On January 26, 1988 Spraying Systems petitioned the Trademark Trial and Appeal Board of the United States Patent and Trademark Office (the "Board") to cancel the two registrations for COLOR JET in Consolidated Cancellation 16,950. On September 14, 1989 the Board granted Delavan's motion for summary judgment and (in the "Decision") dismissed Spraying System's Petition for Cancellation. Spraying Systems then filed this action pursuant to Lanham Act § 21(b) (15 U.S.C. § 1071(b)) within 60 days of the Board's Decision.

*Cancellation Proceedings*

■ This action is in part an appeal from the Decision. In that respect this Court reviews decisions of the Board de novo, and the parties can introduce new evidence not brought before the Board (*Dow Corning Corp. v. Applied Power Industries, Inc.,* 322 F.Supp. 943, 944 (N.D.Ill.1970)). However, it is "well settled" that a Board decision "must be accepted as controlling upon a finding of fact about confusing similarity of trademarks, unless the contrary is established by testimony which in character and amount carries thorough conviction" (*Fleetwood Co. v. Hazel Bishop, Inc.,* 352 F.2d 841, 844 (7th Cir.1965), citing *Morgan v. Daniels,* 153 U.S. 120, 125, 14 S.Ct. 772, 773–74, 38 L.Ed. 657 (1894)).

---

**2.** Those registered trademarks are No. 1,351,698 for non-metal spray nozzles (issued July 30, 1985, claiming use since June 21, 1982) and No. 1,454,865 for metal spray nozzles (issued September 10, 1987, claiming use since November 26, 1986).

**3.** Spraying Systems later added the colors tan and light blue to its palette (Smith Dep. 340–41, D.R.Mem.Ex. 38).

In the action before the Board, it found factually (1) Spraying Systems' priority in use of trademark (which Delavan does not deny), (2) similarity of the goods, channels of trade and purchasers (all three of which have been conceded by Delavan in both that and this action), (3) substantial use and advertising by Spraying Systems of its trademarks and (4) no instances of actual confusion (because none were shown) (Decision 8–9, Complaint Ex. C). Spraying Systems argued to the Board that the combination of the "–JET" suffix and the color coding on both companies' spraying nozzles, as well as use of the word "COLOR" in Delavan's trademark, made consumer confusion likely. But because Spraying Systems did not plead that color coding was a trademark, the Board found that aspect did not raise a genuine issue of material fact (id. at 9–10). Instead it considered likelihood of confusion only between the registered trademarks themselves, noting the sole similarity to be the "–JET" suffix.

On that score Delavan presented evidence of 48 third-party trademark registrations bearing the suffix "–JET" and copies of third-party literature evidencing widespread use of "JET" marks for spray nozzles and related goods. Such evidence, the Board noted, is (id. at 10):

> competent to show that a common portion of a mark has a readily understood and well-known meaning in relation to the goods at issue so as to suggest that said common portion was adopted to convey that meaning or a suggestion thereof and also to show that the inclusion of that portion in each of the parties' marks is alone an insufficient basis on which to predicate a likelihood of confusion.

Upon consideration of the third-party registrations and uses, the Board found that at least 40 of the registrations, as well as all of the trade literature, were for nozzles or related goods and were "sufficiently related to spray nozzles as to make those uses relevant to our determination of whether 'JET' has a commonly understood meaning" (id. at 11). In conclusion, the Board found (id. at 12) (footnote omitted):

> [T]here exists no genuine issue of fact that the use of that particular word in all of these marks was intended to convey its dictionary meaning, i.e., "1. A high-velocity fluid stream forced under pressure out of a small-diameter opening or nozzle. 2. Something emitted in or as if in such a stream ... 3. An outlet, such as a spout or nozzle, for emitting such a stream." (The American Heritage Dictionary (1976)) Because marks must be considered in their entireties, the use of a common, highly suggestive or descriptive portion is usually not enough to support a finding that there is a likelihood of confusion. See Tektronix, Inc. v. Daktronics, Inc. [534 F.2d 915 (C.C.P.A. 1976)].

None of Spraying Systems' marks, in its entirety, was found likely to cause confusion with Delavan's COLOR JET mark (id. at 13).

As the ensuing discussion will demonstrate, an independent review of the tenets of trademark law fortifies the Board's holding. And Spraying Systems has offered nothing new to lead to a "thorough conviction" (the Fleetwood standard) that the Board's holding was incorrect.

### Lanham Act Claims in General

■ Spraying Systems is suing Delavan for both federal trademark infringement and what is commonly thought of as the federal common law of unfair competition under the Lanham Act. 1 McCarthy, Trademarks and Unfair Competition § 8:1, at 282–83 (2d ed. 1984) (footnote omitted) sets out the distinction between the two claims:

> The emphasis and thrust of trademark protection is deciding whether a given symbol in fact functions as a mark and whether defendant's mark is likely to cause confusion. Thus, for trademark infringement purposes, it is only the symbol characterized as a "trademark" which is juxtaposed against defendant's usage. On the other hand, unfair competition protection is not so limited in scope. The court need not focus on merely one facet of plaintiff's total selling "image,"

as in trademark law. To determine unfair competition, the court must consider the total image of plaintiff's product, package and advertising and compare this with defendant's image. If defendant's trade dress is likely to cause confusion with plaintiff's trade dress, then a finding of unfair competition is warranted. The ultimate protection desired—prevention of a likelihood of confusion of buyers—is just as important when a junior user presents a package which in toto is confusingly similar to plaintiff's, as when a mere part of the package (such as a word mark) is simulated.

Whereas the Board addressed only Spraying Systems' claim of infringement of its registered "-JET" trademarks, here Spraying Systems additionally seeks protection of its color-coding scheme as a *trademark* and of its overall product image as *trade dress*. Thus there are in essence two separate trademark infringement claims and one unfair competition claim. Clarity demands a separate analysis of each claim, although the legal analysis and resulting level of protection is exactly the same regardless of whether something is called a trademark or trade dress.

As a preliminary matter, the three major elements of an infringement cause of action were set out in *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989) (citations omitted):

> "Trade dress" refers to the total image of a product, including features such as "size, shape, color or color combinations, texture, graphics, or even particular sales techniques." An infringement of the trade dress is proven if: (1) the plaintiff's trade dress is inherently distinctive or has acquired secondary meaning, (2) the plaintiff's trade dress is primarily non-functional, and (3) the defendant's trade dress is confusingly similar, engendering a likelihood of confusion in the marketplace.

Those basic principles of infringement (equally applicable to trademarks) will be kept in mind as this opinion turns to each claim of trademark or trade dress infringement.

### *"-JET" as a Trademark*

 First this Court takes a fresh look at the Board's Decision that Spraying Systems cannot prevent Delavan from using the "-JET" suffix. To that end Spraying Systems must first demonstrate that "-JET" is a valid trademark. In other words, "a court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark" (*Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986)). And for that purpose it is most often useful to classify the trademark involved as generic, descriptive, suggestive or arbitrary.[4] *Blau*, 781 F.2d at 609 put the reason for those categorizations in these terms:

> But it is no purpose of trademark protection to allow a firm to prevent its competitors from informing consumers about the attributes of the competitors' brands. That is why trademarks that are fanciful (i.e., made up, like "Kodak" or "Exxon"), or arbitrary (e.g., "Black & White" scotch), or suggestive (e.g., "Business Week," "Coppertone") are favored, why generic words (names of products rather than brands—"airplane," for example, or "decaffeinated coffee") may not be trademarked at all, and why descriptive words (e.g., "bubbly" champagne) may be trademarked only if they have acquired secondary meaning, that is, only if most consumers have come to think of the word not as descriptive at all but as the name of the product ("Holiday Inn," for example).... To allow a firm to use as a trademark a generic word, or a descriptive word still understood by the public to describe, would make it difficult for competitors to market their own brands of the same product. Imagine being forbidden to describe a Chevrolet as a "car" or an "automobile" because Ford or Chrysler or Volvo had trademarked these generic words, or an after-

---

**4.** As with all such aids to analysis, of course, a court must be careful to avoid letting the label take the place of the concept that it is intended to convey.

shave lotion as "bracing" because the maker of one brand of aftershave lotion had trademarked this descriptive word.

■ Whether "–JET" can be protected thus turns in part on whether it is a descriptive rather than a suggestive term. *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 379 (7th Cir.1976) found this definition in Seidel, Dalroff and Gonda, *Trademark Law and Practice* § 4.06 at 77 (1963) most helpful in drawing the line between the two:

> Generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.

From a purely definitional standpoint, then, "–JET" is a descriptive term—and the Board's finding that the term conveyed exactly what is set out in the dictionary definition of "jet" has to be correct. Hence Spraying Systems cannot have proprietary rights in the term as such. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1430 (7th Cir.1985) put the matter succinctly:

> There are but a limited number of words and images suitable for use in describing a product, and sellers own neither the English language nor common depictions of goods.

■ Additionally, the Board appropriately took into account third-party registrations and uses of the "–JET" suffix to aid in its determination. In this action Delavan has submitted fully 65 (and not just the earlier-provided 48) third-party registrations as well as trade literature indicating widespread use of the "–JET" formative. When the sole aim is to determine whether or not "–JET" is a descriptive term, it is unimportant that Spraying Systems was able to show that many of the registered trademarks were not in current use (*In re Dayco Products–Eaglemotive Inc.*, 9 U.S. P.Q. (BNA) 2d 1910, 1911 (TTAB 1988) (citation omitted)):

> While ... third party registrations are of limited probative value, they are useful to demonstrate the sense in which a term is used in ordinary parlance and they can

show that a particular term has been adopted by those engaged in a certain field or industry and that said term has less than arbitrary significance with respect to certain goods or services.

Moreover, as the Board had decided, Spraying Systems' argument that some of the registrations were not directly related to the parties' products is also immaterial as long as the use of the term is sufficiently related to show that it is being used in its dictionary meaning (*Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 917 (C.C.P. A.1976)) and also that (*M–F–G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir. 1987) (citation omitted)):

> [t]he mark is "descriptive," meaning that it identifies an attribute of the product; this suggests both that the mark does not extend beyond the product and that its employment has not added new meaning to the word.

Once a term is found to be descriptive, it can be protected only if it has acquired "secondary meaning" (*Blau*, 781 F.2d at 609). Secondary meaning "denotes an association in the mind of the consumer between the trade dress of a product and a particular producer" (*Vaughan Manufacturing Co. v. Brikam International, Inc.*, 814 F.2d 346, 348 (7th Cir.1987)). Thus the Board's determination that the mutual use of the descriptive "–JET" suffix is unlikely to cause confusion carried with it the Board's decision that the term carried no secondary meaning worthy of protection. On that score, Spraying Systems' introduction of new evidence on secondary meaning must be considered by this Court to see whether it is left with a "thorough conviction" that the Board's decision was incorrect.

■ Secondary meaning can be established by one or more of a number of relevant factors: "the amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys" (*Union Carbide*, 531 F.2d at 380). In those areas the only new evidence Spraying Systems has introduced that was not considered by the Board relates to Spraying Systems' con-

sumer surveys. On the issue now under discussion, the only relevant survey is the one pertaining directly to secondary meaning of the "–JET" formative and entitled "SUFFIX STUDY." Its result was that when asked whether the respondents associated six different names having a "–JET" suffix with one company or more than one company, 38% of the 200 respondents associated the names with one company.

At first glance the survey would appear to have been in the proper format for one seeking to ascertain the existence or nonexistence of secondary meaning. It highlighted the relevant determination as described in *Union Carbide*, 531 F.2d at 380 (citing *Spangler Candy Co. v. Crystal Pure Candy Co.*, 353 F.2d 641, 647 (7th Cir.1965)):

> To establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer from which a product emanates. It is sufficient if the public is aware that the product comes from a single, though anonymous, source.

In addition, the question was formulated according to standards approved in a thoughtful discussion of the subject of secondary-meaning surveys by Palladino, *Techniques For Ascertaining If There Is Secondary Meaning,* 73 Trade–Mark Rep. 391, 397–401 (1983) (as discussed previously by this Court in *A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F.Supp. 1081, 1092–94 (N.D.Ill.1985), *aff'd* 796 F.2d 903 (7th Cir. 1986)).

But the survey question as individualized for this case was problematic (to say the least) in a vital respect. Respondents were given a list of six complete "–JET" marks, the first five of which were Spraying Systems' trademarks—two of those were "TEEJET" and "XR TEEJET" —and the last of which was COLOR JET. Such a failure to isolate the mark at issue—here "–JET"—necessarily created an instant bias in the respondent's mind, upon seeing or hearing the first five trademarks in their entirety, to believe that *one* company (Spraying Systems or its popular name "Teejet") was the owner of all six trademarks (see Palladino at 395).[5] However proper the survey question may have been to prove likelihood of confusion between the marks, it was improper to prove secondary meaning.[6] And even beyond that there were global problems with all three of the surveys conducted by Spraying Systems that compel this Court to find the surveys to lack probative value as a matter of law.[7]

5. Dr. Hupfer, the expert who conducted the survey, said in explanation for such a grossly biased question, "Well, I was running out of names for agricultural spray nozzles, and those were the names that I came up [with]" (Hupfer Dep. 281, D.R.Mem.Ex. 40). What he succeeded in doing, of course, was to demonstrate graphically that survey questions as well as purported trademarks can be strongly suggestive.

6. Indeed, Spraying Systems appeared to be offering the survey for purposes of proving likelihood of confusion. As already stated, though, that issue is never reached if secondary meaning is not proved. Also, although a 38% response rate may be perfectly probative for purposes of proving likelihood of confusion, in order to prove secondary meaning a "substantial" portion of buyers must associate the product with one source, and generally over 50% is regarded as clearly sufficient to that end, while a 38% figure would have been marginal even in a *properly* designed survey (see discussion in 2 McCarthy § 32:54, at 785–86).

7. There were three major problems with how the surveys were conducted:

1. As the relevant universe, five states were chosen based upon the information that Dr. Hupfer was "told" that the COLOR JET name had appeared in at least one (and not necessarily all) of the states (Hupfer Dep. 203, D.R.Mem.Ex. 40). Obviously it was necessary to be absolutely sure that COLOR JET was being marketed in the states that served as the universe. Additionally, Spraying Systems Vice President David Smith admitted that three of those five states—which he selected— were Spraying Systems' strongest states for sales of nozzles and tips (Smith Dep. 5, D.R. Mem.Ex. 38).

2. That leads to the next major problem. Dr. Hupfer admitted that the results of the survey would be slanted if in the five-state area Spraying Systems had 80% of the market and Delavan had 15%, requiring the results to be adjusted. However, he had no information on the market share and did not make any appropriate adjustments (Hupfer Dep. 232–35, D.R.Mem.Ex. 40). Although the parties have not provided concrete figures, Smith testified that it is Spraying Systems' belief that it has about 60% of the market share of spray

Taking the survey evidence (with its problems) into account, this Court cannot say that it now has a "thorough conviction" that the Decision of the Board was wrong. There is no genuine issue of material fact as to the conclusion that "-JET" is not a protectible trademark as a matter of law.[8] Just to play the song one more time by paraphrasing *M-F-G*, 817 F.2d at 411 (citations omitted) to fit this case:

> If [Spraying Systems] popularized the word ["jet"] and gave it a meaning on which [Delavan] is trying to capitalize, then the trademark laws offer relief. But if [Spraying Systems] is simply trying to appropriate part of the language that it has neither created nor enriched, and to deny [Delavan] a natural description for its products, then [Spraying Systems] must lose.

### Color Coding Scheme as a Trademark

Next Spraying Systems wants to protect its color coding scheme as a trademark, an argument that the Board did not have an opportunity to address. Here again, Spraying Systems must initially prove validity of the trademark before the question of likelihood of confusion is reached.

■ *Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 9 (7th Cir.1950) (citation omitted) long ago decided that "[a]s a rule color cannot be monopolized to distinguish a product." In other words, color per se can never be protected, and color is protectible only "in connection with some definite arbitrary symbol or design" (*id.*). Even in

that regard courts have been hesitant, for as described in a case of the same vintage, *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 798 (3d Cir.1949):

> What the plaintiffs are really asking for, then, is a right to the exclusive use of labels which are half red and half white for food products. If they may thus monopolize red in all of its shades the next manufacturer may monopolize orange in all its shades and the next yellow in the same way. Obviously, the list of colors will soon run out.

And those principles are alive and well and living in the Seventh Circuit: Late last year *NutraSweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1028 (7th Cir.1990) (citation omitted) reached the identical result in recognition of the inherently limited nature of the rainbow:

> It is likely, however, that if each of the competitors presently in the tabletop sweetener market were permitted to appropriate a particular color for its product, new entrants would be deterred from entering the market. The essential purpose of trademark law is to prevent confusion, not to bar new entrants into the market.

■ To escape that sounding of its death knell, Spraying Systems urges that it is *not* arguing that color *coding* of its nozzles is a protectible trademark, but rather that its particular selection of colors ought to be protected (Smith Dep. 332, D.R.Mem.Ex. 38). Because the companies

---

nozzles and that he guessed that Delavan has about 20 to 25% (Smith Dep. 11–12, D.R. Mem.Ex. 49).

3. All three surveys targeted as respondents the "decision makers" (Hupfer Dep. 61, D.R.Mem.Ex. 40) rather than the actual purchasers of the spraying equipment. There is no evidence that the decision makers were indeed the buyers. Moreover, the fact that farmers (the end users) were chosen as the sole respondents was a highly biased choice, considering that the universe of buyers of the products of the two companies also includes sophisticated purchasers—distributors, equipment manufacturers, dealers/retailers—who the parties confirm are less likely to be confused.

**8.** As did the Board (Decision 12 n. 17), this Court relegates the "family of marks" argument

to a footnote. For Spraying Systems to call its "-JET" marks a family of marks does not enhance its argument in any way. It is still necessary to prove that the "family" feature is arbitrary and distinctive, not just descriptive or highly suggestive or commonly used in the trade (*Marion Laboratories Inc. v. Biochemical/Diagnostics Inc.*, 6 U.S.P.Q. (BNA) 2d 1215, 1218–19 (TTAB 1988)). As stated in 2 McCarthy § 23:19, at 103–04 (footnotes omitted):

> The mere fact of registration of many marks with a common syllable does not in itself prove that a family of marks exists in fact.... In most cases, use of the "family" argument appears to add little, if anything, to a straight argument of a likelihood of confusion between plaintiff's marks and defendant's mark.

do not use the same colors to denote the same nozzle capacities, that amounts to arguing a commonality of color, rather than color plus symbol. But there is nothing inherently distinctive about the colors chosen by Spraying Systems. Protection of Spraying Systems' palette of colors alone would lead then to the very problem wisely warned of in *NutraSweet*, under which "infringement actions could soon degenerate into questions of shade confusion" (917 F.2d at 1027, citing *In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116, 1131 (Fed.Cir.1985) (Bissel, J., dissenting)). That is certainly true here, where Spraying Systems' Vice President David Smith scrutinized the hues chosen by Delavan—comparing shades of blue and green—in an effort to show which of them infringed (Smith Dep. 265, 346, D.R. Mem.Ex. 38).

If an argument could be made at all that a series of specific colors could be protected (a doubtful premise that this Court need neither embrace nor reject for current purposes), Spraying Systems must still be able to prove that the *series* has acquired secondary meaning. It has done nothing to carry its burden in that respect—it focused its efforts instead on trying to prove that secondary meaning has attached to color-coded nozzles in general, rather than to nozzles colored with its own specific palette of colors.

██ Even if Spraying Systems were trying to protect color coding in general, which it professes not to be trying to do, it could not. For one thing, one of the three elements of an infringement claim is that trade dress cannot be protected if it is "functional" (*Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1183 (7th Cir.1989)). "Functionality" was described in *Schwinn*, 870 F.2d at 1188:

> For purposes of a defense against trade dress infringement, "functional" means not simply that the feature serves a function, but that the feature is necessary to afford a competitor the means to compete effectively.

As elaborated in *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 339 (7th Cir.1985):

But if the feature is not ornamental or fanciful or whimsical or arbitrary, but is somehow intrinsic to the entire product consisting of this manufacturer's brand and his rivals' brands, trademark pro[te]ction will be denied.

\* \* \* \* \* \*

To put this differently, a functional feature is one which competitors would have to spend money not to copy but to design around, as they would have to do if they wanted to come up with a nonoval substitute for a football.

Functionality has been especially important in dealing with efforts to protect a particular choice of color. For instance, *Life Savers*, 182 F.2d at 7 held that in the competitive field in which the parties marketed their products, the use of color (including colored stripes) as the background on labels served the function of indicating what color and flavor the candy package contained and hence could not be protected. Similarly, *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1028–29 (9th Cir.1985) upheld a jury finding that color-coding of auto parts was functional because it enabled the mechanic to replace the parts correctly.

Here Delavan has shown and Spraying Systems admits that color coding of spray nozzles is a method used by competitors in the field (Smith Dep. 373–74, D.R.Mem.Ex. 38; P. Response to D.Int. 3 at 11–12, D.Mem.Ex. 31). If one company in the field could monopolize the technique of color coding to aid in the designation of nozzle capacities, other companies would be hard-pressed to come up with an alternative method. Color coding *as an identification system* is clearly functional, despite Spraying Systems' argument that the primary use of its color coding is to designate Spraying Systems as the source. That argument is merely one of convenience for legal purposes—Spraying Systems admits that its use of color coding was originally adopted to serve primarily a functional purpose (Smith Dep. 364, 370, D.R.Mem.Ex. 38) and it only recently decided that its primary use was to designate source (*id.* 360–61). Spraying Systems has not avoid-

ed the functionality defense, nor has it established secondary meaning in color coding in general under the standard announced in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (citation omitted):

> To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.

■ It may be noted parenthetically that it is unclear on the facts which of the two companies was the senior user of color-coded nozzles (Smith Dep. 221–48, D.R. Mem.Ex. 38).[9] But even if it were assumed arguendo that Spraying Systems had been senior, it must still prove the existence of secondary meaning in color coding at the time and place that the junior user—Delavan—first began use of that mark (see McCarthy § 16:12, at 746). Thus Spraying Systems' survey entitled "COLORED SPRAY NOZZLES STUDY," which attempted to ascertain *present* secondary meaning in color coding in general, would not be probative as to the relevant question of secondary meaning when the alleged infringement began—and that would be so even if color coding in general could be properly protected as nonfunctional and even if the survey were not otherwise fatally flawed.

In any case, the issue of color coding in general as a trademark was a digression from Spraying Systems' actual claim in this action: that its particular palette of colors should be protected. On that issue, it has presented *no* evidence to convince this court that its contention is anything other than a desire to protect color per se, and that is a claim that simply cannot be entertained.

## Trade Dress

■ Trade dress infringement claims call for consideration not of each facet of the claimed trade dress separately, but rather of their combined effect. That has long been understood as to trademarks (*Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 416–17, 64 L.Ed. 705 (1920)):

> The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail.

And it is equally true as to claims of protected trade dress (*Scandia Down*, 772 F.2d at 1431) (citations omitted):

> The words and pictures surely are "descriptive" if taken one at a time. But that is not the right way to take them. The eye sees the combination of words, typeface and goose as a unit. The perceptual gestalt may make one combination seem very like another—or very different—even though both have the same formal elements. The district court therefore must consider each mark as a unit.

That "unit"—a product's "trade dress"—is "the overall image used to present it to purchasers; it could thus include, to give a partial list, the product's size, shape, color, graphics, packaging, and label" (*Vaughan*, 814 F.2d at 348 n. 2 (citations omitted)). Exactly the same trademark-type requirements of establishing distinctiveness or secondary meaning apply here, the only difference now being that this Court will consider the product as a whole. That will effectively address Spraying Systems' contention that when the word COLOR is combined with JET and color coded nozzles, as a whole it creates a situation of trade dress infringement even though each taken separately does not.

Even in those terms, however, Spraying Systems has similarly failed to create a genuine issue of material fact in regard to

9. Although Spraying Systems had prior use of color coding, its initial use was substantially different from the present system of both companies. Delavan was the first to employ the system as presently used by each. Indeed, the facts show that Delavan was making a big push

to make color coding its prominent selling feature (P.Mem.Ex. 58), with Spraying Systems responding a step behind (see D.R.Mem.Ex. 51, an internal Spraying Systems letter discussing the refinement of color coding and stating that it "extends what Delavan has done").

its claim of trade dress infringement. Absent a showing of distinctiveness, the features together must be shown to have secondary meaning. And once again Spraying Systems fails on that issue.

■ One of the three surveys conducted by Spraying Systems—the "COLORJET NAME STUDY"—purported to focus on the combined effect of the name COLOR JET plus color coding. However, that survey evidence may not be considered as probative evidence of secondary meaning due to the fatal flaws identified in n. 7. Furthermore, Spraying Systems offered the survey as evidence of likelihood of confusion—and if that is to be the goal of a survey, it must replicate market conditions (Palladino at 396). Here respondents were asked over the telephone what company or companies would come to mind if they received literature or saw a line of spray nozzles that were identified with the word COLOR JET. That is not at all the same as *seeing* the literature, where Delavan's name prominently appears, or *seeing* the product line, where the distinctive packaging and labeling of the nozzles of each company make confusion unlikely (see *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 211 n. 2 (2d Cir.1985), criticizing a telephone survey on like grounds). To make out a claim of unfair competition or trade dress infringement, the packaging and marketing of a product cannot be ignored.[10]

■ On this claim as well, then, Spraying Systems has not created a genuine issue of material fact—this time as to whether its product's trade dress has acquired a secondary meaning and is thereby protectible. Once more it is unnecessary to reach the question of likelihood of confusion.[11]

### Fraud in the Procurement

■ Spraying Systems alleges in Complaint Count II that Delavan filed its application for registration of its COLOR JET

---

**10.** Spraying Systems argues that the end user in the field, the farmer, may have only an unpackaged nozzle from an unidentified source and may go to the store to replace it without the benefit of the packaging. However, there is no evidence in the record to support the speculation that farmers purchase that way, and in any case they would still be faced with the distinct packaging of each product at the time of purchase.

**11.** However, it is worth noting that Spraying Systems would fare no better on a showing of likelihood of confusion. In that respect one of "the more important" factors to consider—one not considered in determining secondary meaning—is evidence of actual confusion (*Ziebart International Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 226 (7th Cir.1986)). Spraying Systems' evidence of actual confusion is doubly flawed:

 1. It interviewed only its own customers, and its own attorney conducted the interviews. Both those factors tend to create bias in the results.

 2. Most of the statements simply evidence a notion of *prospective* confusion, not *actual* confusion, if confronted with a product called COLOR JET. Of those few instances where a customer appeared to indicate actual confusion, Delavan submitted statements by those same customers that they were not actually confused (D.R.Mem.Ex. 43).

It must also be remembered that confusion is troublesome only when trade dress is protectible in the first instance. After all, confusion is to be expected when a particular aspect of a product is functional or generic and is shared by many companies (see *Life Savers,* 182 F.2d at 8). To be sure, it troubles this Court that an end user—a farmer in the field—may conceivably be confused enough to replace a red-coded nozzle (say one of Spraying Systems') with the first red-coded nozzle that he or she sees (that may happen to be Delavan's) and thereby ends up with a different nozzle capacity, so that the farmer could spray more or less pesticide on the crops than he or she had intended. But this Court can only protect as far as the law will allow, and the rest is the market's responsibility (see P.Mem.Ex. 57, 59, 60, reflecting that Delavan has considered approaching the others in the industry with a proposed standardization of color coding to protect end users from confusion). By packaging and marketing its product in a distinctive manner, Delavan has done all it must to prevent confusion (*Life Savers,* 182 F.2d at 8) (citations omitted):

> A new competitor is not held to the obligations of an insurer against all possible confusion. He is not obligated to protect the negligent and inattentive purchaser from confusion resulting from indifference.
>
> \* \* \* \* \* \*
>
> "Instead, they are required only to mark or designate them in such manner that purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken."

784

trademarks with knowledge that Spraying Systems had superior rights in marks with which Delavan's mark was likely to cause confusion. On that claim this Court adheres to the Board's Decision at 13 n. 18:

> In view of our determination that confusion is not likely, the issue of fraud in the execution of respondent's declaration for its application to register is moot.

Spraying Systems has presented no new evidence to give this Court a "thorough conviction" that the Decision was incorrect. Because this Court also finds that Delavan's COLOR JET mark is registrable, Count II need not be considered further (*Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1567 (Fed.Cir. 1987)).

### Pendent State Claims

 With Spraying Systems' federal claims—both trademark and trade dress infringement—having succumbed to Delavan's summary judgment motion, *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) teaches that the proper course is to dismiss—without prejudice, of course—pendent Count V. *Gibbs, id.* at 726–27, 86 S.Ct. at 1139 (citations and footnote omitted) explains the rationale behind such a ruling:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Under the circumstances, *Gibbs* counsels that with no federal claims surviving to serve as the source of attachment, the re-

maining Count and its pendent claims should be dismissed without prejudice.

### Conclusion

This Court has found that there is no genuine issue of material fact as to any of Spraying Systems' federal claims. Delavan is entitled to a judgment as a matter of law as to each of Counts I through IV. Those Counts are dismissed with prejudice. Consequently Count V and its pendent claims are dismissed without prejudice.