**MGM–PATHE COMMUNICATIONS CO., Plaintiff,**

**v.**

**The PINK PANTHER PATROL, and Gerri Wells, Defendants.**

**No. 91 Civ. 0100(PNL).**

United States District Court, S.D. New York.

Oct. 3, 1991.

Abelman, Frayne & Schwab, New York City (Lawrence E. Abelman, Jeffrey A. Schwab and Michael Aschen, of counsel), for plaintiff.

Lakenau & Bickford, Elizabeth A. McNamara, Cooperating Atty. for Lambda Legal Defense and Educ. Fund, and Lambda Legal Defense and Educ. Fund, New York City (Evan Wolfson and Michael T. Isbell, of counsel), for defendants.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiff MGM–Pathe Communications ("MGM") seeks a preliminary injunction barring the defendants from using the name "Pink Panther Patrol" and a paw print design as part of their logo.

## BACKGROUND

### 1. *Plaintiff's Trademark*

MGM is the owner of the federally registered trademark THE PINK PANTHER. The trademark was registered in 1979 by United Artists Corporation. MGM is United Artists' successor in interest. The trademark applies to a popular series of comic films about a bumbling detective and an animated cartoon series. The mark has been licensed for use in connection with the sale of a variety of children's consumer items including T-shirts, sleepwear, hats, tote bags, plush toys and plastic figures as well as such products as fiberglass insulation, automobile air freshners, automobile spare tire covers, and adult clothes.

In 1982, MGM produced and distributed the "Trail of the Pink Panther," one of the eight Pink Panther movies. A stylized Pink Panther paw print ("Paw Print") appeared in the film's opening credits, and was used in the film's in-theater program and promotional posters. Adhesive-backed Paw Prints approximately seven inches in length were used to create a "trail" on sidewalks leading to selected theaters in which the movie was shown. The Trail of the Pink Panther continues to be broadcast on standard and cable television stations, and more than thirty-five thousand copies on video tape cassettes and laser discs have been sold in the United States through March of 1988.

### 2. *Defendants' Adoption of Their Name*

Defendants The Pink Panther Patrol and Gerri Wells (collectively, the "Patrol") are a gay rights activist organization and one of its members.

In early July, 1990, an editorial appeared in *Outweek*, a New York magazine directed at the lesbian and gay community, urging the formation of a group of gay men and women to patrol the streets as protection against the rising tide of attacks against gays. *Outweek* suggested naming the group the "Pink" Panthers. At about the same time, the defendant group met and decided to form a street patrol with the goals of protecting the gay community and educating the general public about violence against gays. The group chose the name "Pink Panther Patrol." Defendants assert that the name alludes to other activist Panther organizations such as the Grey and Black Panthers, changed to pink because pink is a color associated with gay activism.

The organization then selected a logo, an inverted pink triangle with an animal paw in its center. The pink triangle—forced on homosexuals in Nazi Germany for identification purposes—has been adopted by the gay political community as a symbol. By turning the pink triangle on its head, and combining this image with the paw print, the Patrol asserts the message that gay men and lesbians would no longer be victims.

The name and logo of the Patrol were adopted for use on T-shirts and buttons. The Patrol T-shirt is black, with the logo on the front. The back of the shirt reads "The Pink Panther Patrol" in English, and "Patrol" in Spanish and Chinese. Defendants contend that these T-shirts are worn by Patrol volunteers when performing

their duties. The Patrol also created T-shirts and buttons for distribution to the public which contained only the paw-print logo and not the name.

### 3. *The Dispute*

Sometime in July of 1990, MGM learned from media reports that the defendant group was patrolling the streets of New York City wearing black T-shirts with the words "The Pink Panther Patrol" and a stylized paw print against a pink background. Newspaper reports identified defendant Wells as the founder, organizer and leader of the group.

By a letter to Wells dated July 25, 1990, MGM's Senior Counsel and Assistant Secretary, Maria C. Angeletti, demanded that the Pink Panther Patrol cease and desist in its use of the Pink Panther name. Laurie Cohen, an attorney then representing the Patrol, left a telephone message with Angeletti's secretary advising that she was responding to the letter and asking Angeletti to return her call.

On August 8, 1990, Angeletti spoke by telephone with Cohen. Cohen indicated that the Patrol's position was that it was not infringing and that the Patrol had no intention of ceasing in its use of its name or logo.

By a letter to Cohen dated August 14, 1991, Angeletti asked Cohen to reconsider. The letter was apparently misaddressed, and was subsequently resent on August 23, 1990, and accepted on August 28, 1990.

Between August 23, 1990 and September 12, 1990, Angeletti made several unsuccessful attempts to contact Cohen.

By a letter to Wells dated September 19, 1990, Angeletti sought to elicit the Patrol's position regarding MGM's infringement claim, as well as confirmation of whether Cohen was in fact representing the Patrol. Delivery of this letter was accepted on September 24, 1990. Defendants did not respond to this letter.

On December 11, 1990, MGM mailed the defendants a letter, return receipt requested, at the address that it believed to be the headquarters of the Pink Panther Patrol.

The letter recounted Angeletti's attempts to contact Cohen and Wells, and threatened a lawsuit if the Patrol failed to respond. The letter was returned to MGM on January 5, 1991 after two notices were left at the address.

On January 4, 1991, MGM filed the instant action alleging that Defendants were infringing MGM's trademark in violation of the Lanham Act and committing related acts of unfair competition in violation of New York State's General Business Law's prohibition against trademark dilution. The complaint sought an injunction barring defendant's alleged infringements, and damages.

Between January and April of 1991, MGM and the Patrol pursued a negotiated settlement. When these discussions came to naught, MGM moved for a preliminary injunction.

### DISCUSSION

To obtain a preliminary injunction in the Second Circuit, a movant must show " '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunction.' " *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)).

### I. *Irreparable Harm*

MGM contends that it risks irreparable harm from defendants' use of its marks and that it will prevail at trial on the merits on three causes of action: trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1); false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125; and trademark dilution under New York General Business Law, Section 368–d.

■ In the court's view, MGM has successfully shown a substantial likelihood of confusion, irreparable harm and likelihood of success on the merits.

The Pink Panther is a highly distinctive, successful and widely recognized mark referring to MGM's enormously popular comic character and films. MGM has developed this mark to suggest "carefree, comedic, non-political fun." MGM contends this image will irrevocably be undermined and altered by its association with a decidedly serious community political organization engaged in combatting bias and fighting violence.

The Patrol's use of this very distinctive and famous name will raise questions in the minds of the public, as to whether the promoters of the comic Pink Panther are engaged in sponsoring the Patrol's cause and efforts. It raises a likelihood that members of the public will in some fashion associate the plaintiff's enterprise with the defendants'. This is the kind of confusion that the trademark laws are designed to avoid. Such confusion would be likely to have an adverse affect on the value of plaintiff's mark. Such harm to the mark would be difficult to measure and to compensate. The likelihood of confusion resulting from defendants' use of so distinctive and famous a mark is substantial and creates a meaningful risk of irreparable harm.

■ The Patrol contends that MGM's delay in applying for injunctive relief suggest that there is no irreparable harm and and that this "foot-dragging" should bar injunctive relief. MGM learned of the existence of the Patrol in July, 1990, but did not bring suit until January, 1991. The Patrol cites a long line of Second Circuit cases holding that delay in prosecuting a claim of infringement vitiates an assertion of irreparable harm. *See, e.g., Citibank N.A. v. Citytrust,* 756 F.Supp. 273, 276 (2d Cir.1985) (10 weeks from actual notice of alleged infringement); *Century Time Ltd. v. Interchron Ltd.,* 729 F.Supp. 366 (S.D.N.Y.1990) (2 months; six counting settlement discussions); *Comic Strip, Inc. v. Fox Television Stations, Inc.,* 710 F.Supp. 976 (S.D.N.Y.1989) (3 month delay; seven months counting settlement discussions); *Le Cordon Bleu v. BPC Publishing Ltd.,* 327 F.Supp. 267 (S.D.N.Y.1971) (13 week

delay). The rationale of this rule was explained the Second Circuit as follows:

> Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicated at least a reduced need for such drastic, speedy action.... Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.

*Citibank N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985).

Although it is unquestionably true that a trademark plaintiff's delay in seeking relief can impeach a claim of irreperable harm, in this case MGM rebuts convincingly the inference that it in fact risked no harm. MGM was caught in a bind. The defendants threatened to generate bad publicity for MGM. If MGM brought the suit, it would be accused of bias against homosexuality and would suffer adverse publicity and harm. If it did not sue and defendants continued to use the Pink Panther name, its trademark would suffer. Given the dilemma, MGM delayed understandably. Its delay does not rebut the harm it is likely to suffer if relief is not granted.

■ In addition, the Patrol contends that, by MGM's own admission, its merchandising revenues have actually increased during the past year. Moreover, the Patrol contends that another registered trademark for the words "pink panther" exists, and at least 15 other establishments, including a bar and a liquor store, use the Pink Panther name.

These arguments are unavailing. Increases in revenue are not inconsistent with damage to the mark. The fact that there are other establishments that use the name Pink Panther does not contradict the harm suffered by MGM from the Patrol's use of the mark.

## II. Trademark Infringement

The parties agree that the crux of the infringement issue is whether the Patrol's use "is likely to cause confusion, or to cause mistake, or to deceive...." 15 U.S.C. § 1114(1). *See also Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (plaintiff must show "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question").

The parties also agree that it is appropriate in determining the likelihood of confusion to apply the multifactor balancing test articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics, Corp.*, 287 F.2d 492, *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The *Polaroid* factors are:

▪ the strength of the mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap, [5] actual confusion, [6] and the reciprocal of defendant's good faith in adopting its own mark,[1] [7] the quality of defendant's product, [8] and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Id.* at 495. In *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 536 (2d Cir.1964), Judge Friendly added other factors including the relative harm to be suffered through grant or denial of an injunction.

### 1. Strength of the Mark [2]

▪ The strength of a mark "is 'its tendency to identify the goods sold under the mark as emanating from a particular ... source.'" *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988) (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). In the trademark sense, the strength of a mark derives from its fanciful, imaginative or arbitrary distinctive nature. A mark can also be strong in a commercial sense if it has earned widespread recognition in the marketplace and has been subject to widespread advertising. Distinctiveness of the mark is an important factor supporting a claim of infringement because the more distinctive the mark, the more clearly it is that confusion will result from additional entities trading under it. As defendants must concede, plaintiff's is a strong distinctive mark in both senses. This increases the liklelihood of confusion and entitles the mark to a broad cloak of protection against infringers. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987).

### 2. Degree of Similarity Between the Marks

There is a high degree of similarity between plaintiff's The Pink Panther and defendants' Pink Panther Patrol. Defendants argue that the great similarity is diminished because plaintiff and defendants exploit the names in quite different contexts, seeking to evoke different images. *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985). Defendants contend that their mark belongs in an entirely different frame of reference from plaintiff's, theirs being in the realm of the Black Panthers and the Grey Panthers, a world of political activism rather than entertainment. The defendants' point would be stronger if they had adopted the name Pink Panthers—in the plural—rather than the singular. In any event, the similarity is great and the confusion likely.

### 3. Proximity of Products

▪ Although there is a substantial difference between plaintiff's products and

---

[1]. In the current restatements of the *Polaroid* test, this factor is formulated as "the junior user's bad faith *vel non* in adopting the mark." *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1225 (2d Cir.1987).

[2]. MGM pursues its claim under 15 U.S.C. § 1114(1) only with respect to THE PINK PANTHER mark and not the Paw Print.

the service offered by the Patrol, it does not negate the likelihood of confusion. In some circumstances, "distance" between the products of senior and junior user can greatly decrease the likelihood of confusion. This is particularly so where the two use the mark before separate and distinct consumer groups, or where the different nature of the products clearly suggests lack of relationship between the two users. Although there are clearly substantial differences (and distance) between plaintiff's product and defendants' services, these do not insure that confusion will be avoided. MGM, the senior user, uses the mark throughout American society, in nationally televised comic entertainment. It is therefore less likely that the junior use will be directed only to a separate public and that confusion will be avoided. Furthermore, although plaintiff and defendants are primarily engaged in different types of "commerce," the Patrol seeks public recognition for its name and mission in the news media, which is not so distant from plaintiff's field of entertainment. It is indeed entirely likely that a large percentage of the population of the United States might see and hear both plaintiff's and defendants' names during a single evening of nationwide television broadcasting, if a telecast of an MGM film should be followed by a newscast including reference to the Patrol's activities.

Members of the public could easily draw the inference that the sponsor of the famous Pink Panther has loaned its name to the defendants' cause expressing ideological support. The likelihood of such confusion is increased by the fact that MGM has in the past used the Pink Panther character in conjunction with a national campaign to increase awareness of social problems affecting college students.[3]

■ I note also that lack of proximity of the products more strongly favors the junior user in cases of weak non-distinctive trademarks. As to a weak mark (such as Finest, Merit, Champion or Reliable), there will be little likelihood of public assumption of relationship as between widely separat-

ed areas of commerce. On the other hand, if consumers see a strong mark (such as Kodak) on toothpaste, many would assume (or at least wonder whether) that the film company had gone into the toothpaste business. Thus, recognition of the lack of proximity between plaintiff's and defendants' products and services does not in this case substantially reduce the likelihood of confusion.

### 4. Bridging the Gap

■ The observations set forth under "proximity of products" are also pertinent to the issue of "bridging the gap." Although a significant gap exists between the parties' products and services, because MGM and the Patrol are using their marks in the general arenas of entertainment and news which are closely related fields, the "gap" is not as meaningful as the Patrol contends. It is therefore of less significance than the Patrol contends that MGM is unlikely to enter the field of protecting homosexuals from attack. The Patrol is using the Pink Panther name to publicize a social cause and to bring public attention to its actions, not merely to promote a specialized service in a narrow market. Both users are promoting their marks in the same marketplace—the general public for television entertainment and news. Where the two usages are sufficiently likely to engender confusion even in present circumstances, the absence of likelihood that the senior user will go into the junior's field is of less significance.

### 5. Actual Confusion

■ Although proof of *actual* confusion powerfully supports a contention of *likelihood* of confusion, the absence of proof of actual confusion is not fatal to a finding of likelihood, particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987).

**3.** Furthermore, both MGM and the Patrol use

their marks on T-shirts.

■ A court may use common sense inference from established facts to determine whether confusion is likely, even if proof of such existing confusion has not been offered. In some instances, perhaps including this case, the absence of proof of actual confusion may be due to the fact that the junior user's mark is not yet widely known. Furthermore, if the law required proof of actual confusion before likelihood could be found, trademark owners would be required to incur actual irreparable harm before they could obtain protection for their marks. That is not the law.

### 6. Defendant's Good or Bad Faith

The Patrol contends that it is free of any taint of bad faith because it selected its name to emphasize its relationship to the militant and politically effective Black Panthers and Grey Panthers—not the comic Pink Panther. The disclaimer is not entirely convincing. The defendants admit that they were familiar with the famous Pink Panther name. See Affidavit of Gerri Wells ¶ 11.

Although I do not suggest that defendants had any desire to create confusion between themselves and the promoters of the comic entertainment figure, there is nonetheless an element of piggybacking in the adoption of a name which the commercial efforts of another have made famous.

A desire to be associated with the political activism of the Black and Grey Panthers is not incompatible with taking the benefits of a name which has earned a high and favorable recognition. This point is underlined by an article in the *Washington Post* stating, "The Pink Panthers' title, with its echoes both of '60's politicization and silver-screen camp, won swift approval." Cf. "Patrol of the Pink Panthers," *Washington Post* September 19, 1990 at C1. The defendants cannot have been unaware of this benefit.

### 7. Quality of the Products

■ The quality comparison factor concerns itself not so much with the likelihood of confusion as with the likelihood of harm resulting from any such confusion. Although MGM concedes that this factor is not relevant, in the court's view it concedes too much. It is true that there is no relevant quality comparison in the sense that compares goods of superior and inferior quality. But there exists a related concern for images and messages of different character attaching to the same mark. MGM uses its mark to promote an image of lighthearted, nonpolitical, asexual, amicable, comic entertainment. The Patrol's use of the name is associated with political activism, violence, defiance, homosexuality and angry confrontation. Thus, the character of the image each seeks to promote in association with its use of the name is drastically different. The mental images which defendants seek to promote through their use of their name conflict with the images MGM has sought to associate with its mark. If confusion occurs (as I find likely), this factor suggests that the confusion will be destructive to the image the senior user has built around its mark.

### 8. Sophistication of Consumers

■ The likelihood of confusion from name similarity is lessened if the senior user's public is knowledgeable and sophisticated. Such a public is less likely to be fooled or confused by mere name similarity. No such sophistication characterizes the public for plaintiff's Pink Panther mark. Plaintiff's public is the universal moviegoer, television watcher public—including children who watch plaintiff's television cartoons, former children who used to watch them, parents who watch with their children and those who watched the famous comic movies. There is no reason to suppose this public is of sufficient sophistication as to dispel likelihood of confusion.

### III. Balance of Hardships

The balance of hardships resulting from the granting or denial of injunctive relief clearly favors MGM. The Pink Panther name is in no way essential to defendants' successfully carrying out their mission. Nor have they built up a following for the

name over time. Although no doubt defendants would derive benefit from the use of so distinctive and popular a name, especially given the favorable public reception the name has enjoyed for so many years by reason of plaintiff's successful efforts, there is no indication that defendants would suffer any serious harm if deprived of the use of the Pink Panther name.

On the other hand, the harm to the plaintiff resulting from the defendants continued use of the name may be considerable. Plaintiff has developed through years of successful exploitation, an enormously valuable commercial mark which enjoys very widespread and very favorable public recognition. The likelihood of public confusion, the cheapening through repeated use by others and the likely alteration of the image associated with the mark that could result from publicity given to violent attacks and counterattacks involving the Pink Panther Patrol could seriously impair the value and continued usefulness of its mark.

### IV. *Defendants' First Amendment Defense*

The Patrol contends MGM's suit is barred by the First Amendment. They contend that because the Patrol is engaged in political speech, it is less subject to the trademark laws. There is no legal support for this position. The seriousness and virtue of a cause do not confer any right to the use of the trademark of another. *See, e.g., N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Education Fund,* 559 F.Supp. 1337, 1342 (D.D.C.1983), *rev'd on other grounds,* 753 F.2d 131 (D.C.Cir.1985); *American Diabetes Ass'n v. National Diabetes Ass'n,* 533 F.Supp. 16 (E.D.Penn.1981).

\*     \*     \*

I conclude that MGM is entitled under the federal trademark law to preliminary injunction to bar defendants from infringing through the use of plaintiff's mark Pink Panther. I therefore need not consider plaintiff's parallel claim under the New York State Anti Dilution statute.

For the time being, I do not grant plaintiff's application for a preliminary injunction with respect to the use of the paw

print. It is less clear that plaintiff possesses trademark rights in that image, that defendants' image infringes plaintiff's, and that confusion would result from the Patrol's use of a paw print, absent its use of plaintiff's name. The main offense in defendants' use of the paw print was the reinforcement of likely confusion resulting from defendants' use of the Pink Panther name, because use of the paw print replicates the manner in which MGM has in the past publicized the Pink Panther. Once the Patrol ceases using the Pink Panther name, there is less likelihood that MGM will suffer harm or confusion from the Patrol's use of the paw print. Accordingly, the application for preliminary injunction against the paw print is now denied, but may be renewed if future circumstances suggest a greater likelihood of confusion resulting therefrom.

### CONCLUSION

Plaintiff is granted preliminary injunction to bar defendants from infringing through the use of MGM's mark Pink Panther. Preliminary injunction with respect to the use of the paw print is denied.

SO ORDERED.