**CATERPILLAR INC., Plaintiff,**

v.

**The WALT DISNEY COMPANY, and Buena Vista Home Entertainment, Inc., Defendants.**

No. 03–1334.

United States District Court, C.D. Illinois.

Oct. 20, 2003.

Joseph Norvell, Thomas L. Holt, Davis S. Fleming, Brinks, Hofer, Gilson & Lione, Chicago, IL, Timothy L. Bertschy, Robert M. Bennett, Heyl, Royster, Voelker & Allen, Peoria, IL, for Plaintiff.

Matthew M. Neumeier, Jenner & Block, Chicago, IL, Roy G. Davis, David G. Lubben, Davis & Campbell LLC, Peoria, IL, for Defendant.

## ORDER

McDADE, Chief Judge.

Before the Court is Plaintiff's Motion for Temporary Restraining Order [Doc. # 4]. Plaintiff brings this matter before the Court primarily alleging violations of §§ 32(1), 43(a) and 43(c) of the Lanham Act(15 U.S.C. §§ 1114(1), 1125(a) and 1125(c), respectively), in addition to alleging various theories under Illinois State law. Accordingly, the Court has jurisdiction over this matter pursuant to 15 U.S.C. §§ 1121 and 1128 and 28 U.S.C. §§ 1331 and 1338(a) and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1367(a) and 1338(b). Based on the unchallenged allegations in the amended complaint, venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND

Plaintiff Caterpillar, Inc. ("Caterpillar") is a Delaware corporation with its principal place of business in Peoria, Illinois. Caterpillar is engaged in the design, manufacturing and marketing of earth-moving, construction and materials handling machinery and engines for world-wide sales. In this connection, Caterpillar owns multiple registrations for its "Caterpillar," "Cat," "Cat" and design, "Caterpillar" and design, "Caterpillar" stylized, "Cat Diesel Power," "Cat the Rental Store," "Catused.com," "Cat Engineered Durability," and "Cat Plus" marks. In 2002, Caterpillar reported $20.15 billion in multi-national sales and revenues, primarily from the sale of the goods and services listed above bearing its marks. Caterpillar also licenses its marks for use on various products such as clothing, footwear, clothing accessories, and a children's product line from which it reported a total of $850 million in sales and revenues in 2002.

Defendant Walt Disney Company ("Disney") is a Delaware corporation with its principal place of business in Burbank, California. Defendant Buena Vista Home Entertainment, Inc., ("Buena Vista") is a California corporation with its principal place of business in Burbank, California. Caterpillar avers in its complaint that both Disney and Buena Vista conduct business in Peoria, Illinois.

"George of the Jungle 2" ("George 2") is the sequel to the original "George of the Jungle," a comedy that earned the Defendants over $100 million in its theatrical release. Unlike its predecessor, George 2's premiere is limited to the small screen with an estimated 2.2 million copies of the film set for sale in various retail outlets on October 21, 2003. Defendants have staged a national marketing campaign to raise awareness for the release of George 2 in various media outlets throughout the country. These advertisements have highlighted the expected release date, a date that is suddenly in doubt due to this suit and Caterpillar's instant motion for a temporary restraining order ("TRO").

Caterpillar filed the instant suit alleging that the Defendants violated its trademark rights through their production of George 2. George 2 is not scheduled for release until Tuesday, October 21, 2003. As a part of the relief Caterpillar believes that it is entitled to, Caterpillar seeks to enjoin the release of George 2 until the acts allegedly violating its trademarks are undone.

Following an emergency hearing held on October 16, 2003, involving representatives from both Caterpillar and the Defendants, the Court permitted Defendants to file a

written response to Caterpillar's TRO motion. In light of George 2's imminent release, the Court also permitted Caterpillar to file a written reply by 9:30 a.m. on October 18, 2003. This Order now follows.

## LEGAL STANDARD

"A party seeking to obtain a preliminary injunction [or temporary restraining order] must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir.2001) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992)). If the Court is satisfied that these three conditions are met, the Court must then consider the irreparable harm that the non-moving party will suffer if the injunction is granted and balance such harm against the irreparable harm the moving party will suffer if the injunction is not granted. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir.1994). As a final matter, the Court must consider the public interest when deciding whether to grant or deny the injunction. *Id.* The preceding considerations are dealt with on a flexible, sliding scale approach. The greater the likelihood of success on the merits, the less irreparable harm is necessary for an injunction to issue. *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1137 (7th Cir.1994). This sliding scale approach is not mathematical in nature, it is instead "more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Abbott Labs.*, 971 F.2d at 12 (citations omitted).

## DISCUSSION

George 2 is an 87 minute comedy primarily targeted at children. It chronicles the exploits of its eponymous hero following the first movie. George is a noble man of nature described as the "klutzy king of the jungle" on the website who possesses an unusually thick and durable cranium. He is blessed with a lovely wife Ursula and a five-year-old son. George is also a friendly fellow, beloved by most of the creatures living on Ape Mountain. Indeed, he is a linguist of the highest order by virtue of being able to converse with apparently every animal species in their native tongue. His speeches are admirable for their laconic directness and economy of words. He is a hardy fellow in that he is blessed with an incredible constitution that allows him to survive his rather routine bone-crushing collisions with various inanimate objects throughout the movie that would cripple or kill an ordinary man. There is one area where George is deficient, however, in that he is naive and not particularly skilled in navigating the civilized dissembling world of modern society; thereby confirming Maharbal's observation to Hannibal following the Battle of Cannae in 216 BC that the gods do not give all their gifts to one man.

The plot of the movie revolves around the Machievellian machinations of Ursula's worldly mother, Beatrice, and Ursula's sophisticated fumbling former fiancee, Lyle, to separate George from his beloved wife and son. In his misguided quest for Ursula's love and hand in marriage, Lyle conceives a plot to steal George's deed to Ape Mountain, which would allow him to send his "dastardly disciples" on dozers to destroy Ape Mountain.[1] Presumably, the destruction of George and Ursula's home

---

1. Beatrice and Lyle conceive of several other plans that fail, but this plot is the one most relevant to the issue at hand.

would somehow drive Ursula back into Lyle's waiting arms. To make a long story short, Lyle succeeds in obtaining the deed to Ape Island by theft. With this deed in hand, Lyle's minions move into action which is where Caterpillar enters the picture, *in media res.*

The problem with George 2 from Caterpillar's perspective is that Lyle's minions are shown in the movie driving Caterpillar bulldozers. These are genuine Caterpillar products bearing the Caterpillar and Cat trademarks on them with no apparent alterations. There are four separate scenes featuring the Caterpillar bulldozers. Three of these scenes show brief glimpses of the bulldozers moving toward Ape Mountain at various angles in which a viewer could make out the Caterpillar trademarks. However, these scenes are brief, averaging approximately ten seconds apiece. The final scene is a seven minute battle scene between George and his animal allies against these bulldozers driven by Lyle's minions. Caterpillar's marks are clearly visible in several instances during this battle. While the action is occurring onscreen, the narrator will occasionally chime in with descriptions of the machines as "deleterious dozers," "maniacal machines" and other similar comments. The bulldozers, however, are not computer animated and look and perform as expected of their type; and it is clear that the bulldozers are operated by Lyle's henchmen. George and his allies manage to decommission these bulldozers in several different ways, generally involving instances of combustible ape flatulence and projectile coconuts and animal feces.

Caterpillar contends that the Defendants have infringed its trademarks, engaged in unfair competition, diluted its trademarks and engaged in deceptive trade practices in producing George 2. Should the Court decline to grant Caterpillar the TRO, Caterpillar contends that no adequate remedy exists in law and that it will suffer irreparable harm. Furthermore, Caterpillar maintains that the balancing of harms favors granting of the TRO as well as the public interest. The Court will consider each factor in turn.

## I. Likelihood of Success on the Merits

Caterpillar alleges four causes of action against the Defendants in its amended complaint: (1) trademark infringement pursuant to § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution pursuant to § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and (4) deceptive trade practices pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq.* In its brief and during the hearing, Caterpillar stated that trademark infringement and trademark dilution comprise its two main causes of action.[2] Ac-

2. Caterpillar couches its claim of infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). However, the plain language of the 15 U.S.C. § 1114(1)(a) and (b) require that there be a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" to maintain a suit under this section. This is not the case here. Defendants do not have any copies or reproductions of Caterpillar's trademarks in George 2, they have the actual genuine trademarks. This being the case, it appears that Caterpillar's claim is really one of unfair competition pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides as follows:
(a) Civil Action
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, *or association of such person*

cordingly, the Court will limit its analysis on the likelihood of success prong to these two claims.

### a. Trademark Infringement/Unfair Competition

Caterpillar contends that the Defendants' use of its products and trademarks in George 2 is unauthorized.[3] As a result, Caterpillar argues that the mere unauthorized appearance of Caterpillar's bulldozers bearing its trademarks in George 2 for a span of approximately eight minutes infringes upon its trademark rights. As the Court understands Caterpillar's argument, Caterpillar is contending that the appearance of its products and trademarks is likely to confuse consumers into believing that George 2 is somehow sponsored by, associated with, or otherwise affiliated with Caterpillar.

■ Under the traditional analytical format set forth in § 43(a) of the Lanham Act, Caterpillar must establish: (1) that it has protectable trademarks; and (2) a "likelihood of confusion" exists as to Caterpillar's sponsorship of George 2. *See* 15 U.S.C. § 1125(a)(1)(A); *see also James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976). At this stage, however, Caterpillar need only show that it has a "better than negligible" chance of succeeding on the merits to justify injunctive relief. *International Ken-*

*with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person* ... shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act. (emphasis added). However, this change in statute and terminology does not alter the essential analysis, which is whether a likelihood of confusion exists. *See James Burrough Ltd. v. Sign of Beefeater*, 540 F.2d 266, 274 n. 16 (7th Cir.1976). "Trademark infringement is one form of unfair competition and the same set of facts support a suit for either." *Id.* (citations omitted). With this in mind and

*nel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988).

Caterpillar has submitted evidence attesting to the registration of their trademarks in the principal register of the United States Patent and Trademark Office. These registrations are "prima facie evidence of the validity of the registered mark" and of Caterpillar's exclusive right to use these registered trademarks in connection with its products. 15 U.S.C. § 1115(a). In this regard, Defendants do not contest the validity of Caterpillar's trademarks.

In order to succeed on its unfair competition claim, Caterpillar must show that there is a likelihood that consumers will be confused regarding Caterpillar's sponsorship of George 2. *See James Burrough*, 540 F.2d at 274. When evaluating whether a likelihood of confusion exists, it is well established that "[a] variety of factors may be material in assessing the likelihood of confusion" and that "[n]one of these factors by itself is dispositive of the likelihood of confusion question." *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167 (7th Cir.1986) (citations omitted). The Seventh Circuit has set forth the following seven factors in determining the likelihood of confusion:

 (1) similarity between the marks in appearance and suggestion;

for the purposes of this Order, any reference by the Court to infringement means unfair competition as defined by 15 U.S.C. § 1125(a).

**3.** There is some controversy on this point. Defendants have produced affidavits from the Australian production company attesting to the proper procurement of the equipment averring that the authorized Caterpillar dealer consented to the use of Caterpillar's equipment and trademarks. Regardless, the Court will presume for the purposes of this Order that the Defendants' use of Caterpillar's trademarks and products was unauthorized.

(2) similarity of products;

(3) area and manner of concurrent use;

(4) degree of care likely to be exercised by consumers;

(5) strength of complainant's mark;

(6) actual confusion; and,

(7) intent of defendant to 'palm off his product as that of another.'

*Smith Fiberglass Prods. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir.1993); *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir.1988). These factors are not a mechanical checklist, and "[t]he proper weight given to each ... will vary from case to case." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir.2000) (quoting *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 381 (7th Cir.1996)). When the Court evaluates the likelihood of confusion, "the actual and reasoned weighing of the evidence is imperative and is inherent in a meaningful exercise of discretion[,]" *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1184 (7th Cir.1989), as is the explicit balancing of the test's factors. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir.2000).

■ This is not a case where the Court can apply the traditional likelihood of confusion factors with any degree of comfort. For example, there are no competing trademarks at issue in this case, there is only one. There is no dispute in this case that the bulldozers used in George 2 are Caterpillar bulldozers bearing authentic Caterpillar trademarks. In a similar fashion, there is no apparent competition between Caterpillar bulldozers and George 2 videos and DVDs.[4] Nor is there any indication of any actual consumer confusion, although the absence of such evidence is understandable due to the fact that Defendants have yet to release George 2 to the public.[5] There is room for Caterpillar to argue Defendants' bad intent in utilizing Caterpillar's products and trademarks in George 2 without Caterpillar's authorization. But even this factor is problematic due to the absence of any indication that the Defendants used Caterpillar's trademarks and products to drive the sales or some other consumer awareness of George 2 videos and DVDs. It is the seeming absence of any indication of Defendants' intent to somehow poach or free-ride on the fame and goodwill of Caterpillar's trademarks that troubles the Court with regard to Caterpillar's unfair competition claim. Caterpillar's position seems to be simply that its products and trademarks appeared in George 2 without authorization in four scenes and that the appearance of its trademarks and products should be sufficient to constitute unfair competition under § 43(a) of the Lanham Act. Part of what drives the Court's discomfort with Caterpillar's position is the fact that the appearance of products bearing well known trademarks in cinema and television is a common phenomenon. For example, action movies frequently feature automobiles in a variety of situations. Is the

---

**4.** Caterpillar apparently sponsors a line of "I love Cat Machines" videos marketed toward children. It is a part of their secondary line of products it produces as part of its licensing program. There is no dispute in this case the vast majority of Caterpillar's sales and revenues are derived from its heavy machinery and equipment business. It is not clear to the Court what the significance is of this line of videos, and Caterpillar has not advanced any arguments incorporating the existence of these videos in arguing unfair competition.

**5.** The Court does note that there is a national advertising campaign for George 2 that has been ongoing for at least the past month. As a result, the possibility does exist that Caterpillar could show confusion based on Defendants' marketing campaign. However, Caterpillar has not done so yet.

mere appearance of a Ford Taurus in a garden variety car chase scene sufficient by itself to constitute unfair competition? Given these concerns, the Court feels it is instructive to take a metaphorical step back at this stage and examine the purpose behind trademarks and trademark law.

> Trademarks help consumers select goods. By identifying the source of goods, they convey valuable information to consumers at lower costs. Easily identified trademarks reduce the costs consumers incur in searching for what they desire, and the lower the costs of search the more competitive the market.

*Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1429 (7th Cir.1985), *cert. denied,* 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1985). By providing what is essentially a shortcut to identify products that possess qualities and properties desirable to consumers, trademarks are valuable assets. *See id.* at 1429–30. The value of a trademark therefore creates a powerful inducement for other parties to take a free ride on its fame. *Id.* at 1430. And indeed, "[t]he more valuable the trademark, the more other firms will be tempted to take a free ride." *Id.* It does not appear to the Court that an intent to free ride on the fame of Caterpillar's trademarks to spur the sales and awareness for Defendants' George 2 movie is present here. Put another way, it appears unlikely to the Court from the limited record before it that any consumer would be more likely to buy or watch George 2 because of any mistaken belief that Caterpillar sponsored this movie.[6]

There does not appear to be anything in the limited record before the Court to show that the Defendants somehow took advantage of the fame of Caterpillar's trademark to drive awareness or sales of George 2.[7] However, the Court is reluctant at this early stage of the proceedings to rule that Caterpillar has no likelihood of proving its claim of unfair competition, despite the substantial misgivings it has. However, the slightly more than negligible likelihood of success on this claim will commensurately increase Caterpillar's burden of proving that the balance of harms is in its favor. *See Ty, Inc.,* 237 F.3d at 895.

---

6. The seeming absence of any intent to free ride on the fame of Caterpillar's trademarks is what distinguishes the instant case from the case law cited by Caterpillar. The defendant in *MGM–Pathe Communications Co. v. Pink Panther Patrol,* 774 F.Supp. 869 (S.D.N.Y. 1991), was a gay rights organization that used the plaintiff's "Pink Panther" mark as a part of its name. The court enjoined defendant from using that trademark in its name in part because it found that the defendant could not have been unaware of the benefits of piggybacking onto the fame of said trademark when it incorporated it into its name. *Id.* at 876. *Brach Van Houten Holding v. Save Brach's Coalition,* 856 F.Supp. 472 (N.D.Ill. 1994), likewise involved a defendant labor group that appropriated the trademark of the plaintiff into its group name. For obscure groups with no mark on the public consciousness, there is a clear incentive to free ride on the fame of a well known trademark as a shortcut to raising awareness and publicity for their causes. The use of a famous trademark grants them awareness and publicity that they would otherwise not have. In a similar fashion, the defendant's adoption of the distinctive trade dress of the Dallas Cowboy cheerleaders and the advertising campaign insinuating that the actress in the pornographic film "Debbie does Dallas" was a clear attempt to capitalize on the fame of the Dallas Cowboy cheerleaders' trademark to drive the sales and awareness of the movie in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979).

7. Caterpillar alleges that the trailer for George 2 on Defendants' website showed clips of its bulldozer with its trademarks visible. This trailer is no longer available. As a result, the Court cannot discern what impact, if any, this trailer might have on the likelihood of confusion analysis.

### b. Trademark Dilution

Caterpillar's other main cause of action involves the concept of trademark dilution. In the movie, the villainous Lyle dispatches his henchmen on Caterpillar bulldozers to raze Ape Mountain. During the scenes leading up to the battle and the battle itself, the narrator describes these bulldozers as "deleterious dozers," "maniacal machinery," and by other similar descriptions. Caterpillar is perhaps rightfully disturbed to see its products associated with the embodiment of evil that is Lyle, although the Court notes that Lyle's evil is of a spectacularly incompetent sort.

To prove dilution, Caterpillar must show that (1) it possesses a famous trademark; and (2) Defendant has caused dilution of the distinctive quality of the trademark. *See* 15 U.S.C. § 1125(c)(1). In considering whether a trademark is famous and distinctive, the Court should take into account the following factors: (A) the degree of inherent or acquired distinctiveness; (B) the duration and extent of use of the trademark in connection with the goods and services with which the mark is used; (C) the duration and extent of advertising and publicity of the trademark; (D) the geographical extent of the trading area in which the trademark is used; (E) the channels of trade for the goods and services with which the trademark is used; (F) the degree of recognition of the trademark in the trading area and channels of trade used by the trademarks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar trademarks by third parties; and (H) whether the trademark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(1)(A)-(H). There is no question in this case that the Caterpillar marks are famous. The key question is whether Defendants have diluted these trademarks through their use of them in their film.

As stated earlier, trademarks serve as an identifier of the source of the products, goods or services in question. *See Scandia,* 772 F.2d at 1429. That is not the only function that trademarks serve. A trademark can also attest to the quality of the product to which it is associated with. *Id.* at 1430. In this regard, there is a dynamic interaction between consumers and a trademark. A trademark can lead consumers to expect a certain level of quality in the product to which it is affixed, presumably increasing sales or awareness of the product. *Id.* Conversely, when consumers purchase a subpar product bearing that trademark and are disappointed, they respond by devaluing the trademark. *Id.*

In general, dilution appears in two forms—blurring and tarnishment. Blurring is an attack on the identification properties of a trademark that may occur "where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability as a unique identifier of the plaintiff's product." *Deere and Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2nd Cir.1994). This is not the case here and Caterpillar does not argue blurring before the Court.

Rather, Caterpillar alleges that the use of its products and trademarks in George 2 will tarnish the reputation of its business and products. *Deere and Co.* defines tarnishment in the following fashion:

> "Tarnishment" generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. In such situations, the trademark's reputa-

tion and commercial value might be diminished because the public will associate the lack of quality or the lack of prestige in the defendant's goods with the plaintiff's unrelated goods, or because the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services.

*Id.*

There is a threshold matter for the Court to consider before analyzing whether Defendants' use of Caterpillar's trademarks and products constitutes tarnishment. Defendants direct the Court's attention to a recently decided Supreme Court case, *Moseley v. v. Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). *Moseley* states that a plaintiff seeking injunctive relief under § 43(c) of the Lanham Act must make a showing of actual dilution. *Moseley*, 123 S.Ct. at 1124, 123 S.Ct. 1115. However, this decision discussed only blurring, although it did leave open the question of whether tarnishment is within the scope of § 43(c). *See id.* Assuming that actual dilution must be shown for tarnishment cases, it is unclear what type of showing Caterpillar must make. *Moseley* makes it clear that plaintiff need not prove actual loss of sales or profits to satisfy this requirement. *Id.* Nor is direct evidence of dilution via consumer surveys necessary if actual dilution can be reliably proved through circumstantial evidence. *Id.* at 1125. Not surprisingly, there is nothing in the record to suggest that Caterpillar has actually lost sales or profits, nor is there any consumer survey evidence showing actual dilution; this is understandable since George 2 has not yet been released to the public in the United States. In any event, there is no basis in the record for the Court to find that there is a likelihood that Caterpillar will be able to prove actual dilution. To take a position one way or another would be an exercise in speculation.

■ There is nothing in George 2 to even remotely suggest that Caterpillar products are shoddy or of low quality. And indeed, Caterpillar does not press this point. Rather, Caterpillar maintains that the portrayal of its products and trademarks in George 2 casts them in an unwholesome or unsavory light. The Court finds this argument to be unpersuasive.

There are several reasons for this, the first being context. As stated earlier, George 2 is a children's comedy that is really a live action cartoon. It borrows many motifs from its animated forebears such as belated recognition close-ups, collisions so bone-jarring that George's outline is left embedded into a tree and other such well established cartoon cliches that clearly establish the fantastic nature of the movie.

Caterpillar points out that the narrator at various stages describes its products as "deleterious dozers," and "maniacal machines." In a sense, Caterpillar is arguing that the narrator is giving anthropomorphic attributes to the bulldozers, thereby somehow implying that the machines are directly responsible for the attempted destruction of Ape Mountain. However, it is clear to even the most credulous viewer or child that the bulldozers in the movie are operated by humans and are merely inanimate implements of Lyle's environmentally unfriendly schemes. Accordingly, the Court does not find that Caterpillar is likely to succeed on its claims of trademark dilution.

## II. Balancing of Harms

■ The Court has already determined that Caterpillar's likelihood of success on the merits of its unfair competition claim is slight. Under the sliding scale approach

used in this circuit, Caterpillar's burden of showing that the balance of irreparable harms favoring it is therefore correspondingly heavier. *See Ty, Inc.,* 237 F.3d at 895.

Should the Court deny the TRO, the public will be free to purchase George 2 on October 21, 2003. As a result, Caterpillar believes that its business reputation will be irreparably harmed. Irreparable harm is generally presumed in cases of trademark infringement and trademark dilution. *See Eli Lilly,* 233 F.3d at 469; *see also Abbott Labs.,* 971 F.2d at 16 (regarding the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss"); *American Dairy Queen Corp. v. New Line Productions, Inc.,* 35 F.Supp.2d 727, 729 (D.Minn.1998) (presuming irreparable harm by dilution). Additionally, it has been recognized that such irreparable harm is "not susceptible to adequate measurement for remedy at law. . . ." *See International Kennel Club,* 846 F.2d at 1092.

As a practical matter, however, the harm to Caterpillar will be slight. It is incredible for this Court to imagine a consumer's decision to purchase Caterpillar's primary product line of heavy machinery and equipment, costing substantial sums of money, being affected after watching this film. The Court does not believe that the consumers of heavy machinery and equipment from which Caterpillar derives the bulk of its revenues would be susceptible to having their purchasing decisions affected by this movie. At best, there is the possibility that children traumatized by the use of Caterpillar bulldozers in this movie will refuse to purchase licensed Caterpillar goods such as "I love Cat Machines" videos. As stated earlier, Caterpillar derived approximately $850 million in sales and revenues from the sale of licensed goods in 2002, or less than five percent of its overall sales and revenues that year. It is unclear what percentage children's products comprise of that total. As a result, the Court cannot gauge the effect the release of George 2 might have on Caterpillar's children's merchandise.

Conversely, should the Court impose a TRO on the release of George 2, the Defendants would lose the benefits of its ongoing nationwide marketing campaign promoting the imminent release date of October 21, 2003. This would entail the disruption of simultaneous marketing campaigns mounted by retailers and other associated parties made in reliance of the October 21, 2003, release date. Re-release of George 2 would require mounting another, potentially more costly marketing campaign and would result in the loss of more time during the holiday season. Furthermore, the costs and time lost in making the alterations desired by Caterpillar will be substantial. As a result, the Court holds that granting the TRO will do more than merely preserve the status quo.

It is clear to the Court from the preceding that the balance of harms substantially favors Defendants. In reaching this conclusion, the Court must also consider the interest of the public and private interests. In this regard, the Court should attempt to "minimize the costs of being mistaken." In this regard, the Court holds that the costs of being mistaken are substantially higher for the Defendants than for Caterpillar. Accordingly, the Court denies Caterpillar's Motion for Temporary Restraining Order.

### CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Temporary Restraining Order [Doc. # 4] is DENIED. This

matter is referred to Magistrate Judge Gorman for a Rule 16 hearing.